IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

**IN RE GABERIEL S. ET AL.**

**Appeal from the Juvenile Court for Dekalb County**
**Nos. 2017-JV-115, 2015-JV-157     Bratten H. Cook II, Judge**

_____

**No. M2018-00522-COA-R3-PT**

_____

A father appeals the termination of his parental rights to his four children. The juvenile court found five statutory grounds for termination: (1) abandonment by willful failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; (4) persistence of conditions; and (5) failure to manifest an ability and willingness to personally assume custody or financial responsibility of the children. The court also found that termination of the father's parental rights was in the children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which CHARLES D. SUSANO JR., and BRANDON O. GIBSON, JJ., joined.

James Marlon Judkins, Smithville, Tennessee, for the appellant, Robert Alan S.[1]

Herbert H. Slatery III, Attorney General and Reporter, and Jordan Keith Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Lena Ann Buck, Smithville, Tennessee, for the minor children, Gaberiel S., Cody S., Ryan S., and Tristian S.

**OPINION**

Robert Alan S. ("Father") is the father of four sons: Gaberiel (born in 2002), Cody (born in 2004), Ryan (born in 2006), and Tristian (born in 2008).[2] The family has a very

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

long history with the Tennessee Department of Children's Services ("DCS"). Prior to this case, DCS had been involved with them for the past eight years, having received fourteen previous referrals involving the family. Sixty-six allegations of abuse and/or neglect were made against the parents, the parents were "indicated" for abuse or neglect against the children thirteen times, and DCS placed services in the home on twenty different occasions. More recently, the children were removed from the home in February 2014 and placed in state custody for over a year. The children were returned to the home in April 2015, at which point DCS was still providing services for the family.

Since the children's return to the parents' custody in April 2015, the family's problems continued. The police were called to the home multiple times due to domestic violence. Father condoned fighting and wrestling matches between the children. He taught them that it was acceptable to call Mother expletive names and told the children that they did not have to obey women.

There were also concerns of environmental and nutritional neglect. In September 2015, Gaberiel and Cody developed staph infections in sores on their arms and legs, and the wounds were "open, uncovered, and untreated." After a call to DCS, the boys were finally taken to the doctor and given an antibiotic. In November 2015, the family went without water and electricity "for several weeks," and the home "was in total disarray with clothes . . . strewn everywhere and dirty dishes all over the kitchen." Later that month, Cody came to school "extremely dirty and smelly," and he "was wearing the same pants from the day before that were very soiled." The next week, Gaberiel arrived at school wearing shoes that were too small, one of which was torn open at the toe. School personnel reported that the children often asked for food, claiming that there was none in the home.

Moreover, Gaberiel and Cody were not receiving their psychotropic medications as prescribed. School personnel reported that there had been at least three times that school year that Cody had been without his medicine for multiple days and that the children regularly missed doctors' appointments to refill their prescriptions, or shared similar medications with their siblings whenever one ran out. On December 3, 2015, Cody was taken from school by ambulance to the emergency room because he was suffering from withdrawal symptoms from being off his medications.

Drug exposure was also a concern. The children reported that Father and his girlfriend, Ellissa M., with whom he was living at the time, smoked marijuana and sold pills. On December 8, 2015, Father's girlfriend tested positive for drugs and seemed "to be in a very intoxicated state." Father refused to submit to a drug test that day. Three days

---

[2] The mother, Christy Lee S. ("Mother"), also had her parental rights terminated, but she has not appealed. Therefore, our focus in this opinion is only on the facts relevant to Father.

later, he tested positive for benzodiazepine, for which he did not have a prescription. Nevertheless, Father denied drug use.

On December 11, 2015, the children were removed from the parents' home and placed in state custody due to domestic violence in the home, medical neglect, environmental neglect, and the parents' substance abuse. Shortly thereafter, DCS filed a petition in the Juvenile Court of Dekalb County to declare the children dependent and neglected.

Two permanency plans were developed in this case. The first permanency plan was developed on December 29, 2015. The plan required Father to: pay child support for each child according to the child-support guidelines; ensure visitations were meaningful and age-appropriate; bring healthy drinks and snacks to visits; refrain from bringing non-approved individuals to visits; provide proof of safe and stable housing for a minimum of three consecutive months; allow DCS to conduct announced and unannounced home visits; provide proof of legal income sufficient to provide for the family; attend and successfully complete counseling geared toward parenting children with special education, mental health, and physical wellbeing needs; demonstrate what was learned through counseling; submit to a psychological evaluation with a clinical-parenting component and competency evaluation; and sign releases of information for all service providers. Father was given an explanation of his responsibilities under the plan and had a clear understanding of what he needed to complete, in part because he had been through this process with DCS before and successfully completed the necessary steps to regain custody of his children on previous occasions.

During the first four months after the children's removal from the home (December 11, 2015, to April 11, 2016), DCS supervised visits, attempted to conduct a home visit with the parents, conducted several Child and Family Team Meetings ("CFTMs"), attempted to arrange public transportation, requested funding for transportation, and attempted to arrange and requested funding for Father's psychological evaluation. Despite DCS's efforts, Father "did not complete anything" under the permanency plan. He never participated in counseling geared toward parenting children with special needs. Nor did he did complete his psychological evaluation. Initially, DCS requested funding for an evaluation with Scott Herman, but Father refused to be seen by Mr. Herman and requested that the evaluation be completed by John Crody instead. DCS acquiesced and scheduled four appointments with Mr. Crody. Mr. Crody informed Father that he needed to participate in several appointments to complete the evaluation, and the family services worker for DCS called Father several times to remind him of the appointments. Nevertheless, Father attended only one of the four appointments.

On May 11, 2016, the juvenile court entered an order adjudicating the children dependent and neglected.

A second permanency plan was developed on June 16, 2016. It added requirements that Father: follow the recommendations of the psychological evaluation; attend all recommended follow-up appointments regarding mental health and parenting; maintain appropriate and safe housing; ensure that all monthly expenses were paid; develop a budget with the family service worker; and report to DCS within twenty-four hours any changes in circumstances, including address, phone number, and employment. Father participated in the development of the plan by phone, and Sarah Halliburton, the family service worker for the family at that time, discussed with Father his responsibilities under the plan.

The parents appealed the juvenile court's dependent and neglected finding to the circuit court for a de novo hearing, which was held on November 2, 2016; however, neither parent attended. In an order filed on December 12, 2016, the circuit court found that the children were dependent and neglected, stating:

> It is clear that the mother and father both had access to TennCare. Neither the mother nor the father took the children to their medical appointments. The children continued to run out of their medications, which was life or death for Cody because he has diabetes. It was also important for Gaberiel and Cody because they each have mental health issues that are being treated. The lack of medication hurt the children in their school work.

The circuit court ordered DCS to retain custody of the children and suspended visitation between the parents and children, noting that the parents could petition the juvenile court to regain their visitation rights.

The juvenile court held an annual permanency hearing on December 19, 2016, which Father did not attend. The court found that Father was not in compliance with the current permanency plan because Father had "(1) missed three psychological appointments; (2) refused to provide proof of income; (3) continually refuses to let the case manager in the home; (4) not maintained contact with the case manager; and (5) missed several visits with his children," and further ordered that the children remain in foster care. Father also failed to attend the next three hearings in January, July, and October 2017, during which the court reviewed and ratified the most current permanency plans. Father also failed to attend the next annual permanency hearing on December 13, 2017.

On January 3, 2017, DCS petitioned the Dekalb County Juvenile Court to terminate Mother and Father's parental rights as to their four sons. Trial was held on January 9, 2018. The juvenile court heard testimony from Sarah Halliburton, a family support worker with DCS; Angie Brown, team leader for foster care with DCS; DCS investigator Deandrea Miller; and Father. Mother failed to appear at trial.

Deandrea Miller is the investigator with DCS who was assigned to the family's case leading up to the children's removal from the home in December 2015. Ms. Miller stated the family had a "very, very long history" with DCS, including numerous issues with domestic violence. Ms. Miller worked with the family for years, off and on, providing services in an attempt to keep the family together. She testified that the reasons the children were taken into DCS custody in this case were for environmental neglect, medical maltreatment, nutritional neglect, educational neglect, and drug exposure.

Ms. Miller stated that when she was assigned to the case initially, Father and Mother lived in the house with their four children, along with Father's girlfriend, Ellissa M., her two children, and another man named Jim H. According to Ms. Miller, the home "was a disaster" prior to the children's removal. There were clothes strewn everywhere, trash on the floor, and multiple animals in the home. The children did not have beds, only mattresses on the floor with no sheets. Additionally, "The kids would brag they had over 1,000 DVDs, but yet they didn't have a bed to sleep on." Ms. Miller also testified that the children were frequently hungry and did not get enough to eat.

Ms. Miller continued to work with the family after Cody was taken to the emergency room in December 2015 for medication withdrawal symptoms. Ms. Miller explained that Gaberiel and Cody were prescribed several different psychotropic medications and that they were not getting their medications as prescribed. Ms. Miller testified that Mother and Father were separated by this time and that Father was staying with his girlfriend. Mother told Ms. Miller that Father did not help her get the children to their doctor's appointments or "do anything for … the kids." Father attended some of the CFTMs, but Ms. Miller said he refused to submit to some of the drug tests and essentially "chose not to provide any support" for his family.

Additionally, Father allowed the children to disrespect their mother by calling her names, cursing at her, and hitting her. Ms. Miller heard Gaberiel say to his mother, "Shut up, you effing C-[*]-N-T." Gaberiel told Ms. Miller "that's how his daddy talks to him, and his daddy told him that they could all talk to their mama that way." Gaberiel also told Ms. Miller, "My daddy told me we don't have to listen to what women say."

Ms. Miller was also involved with the removal of Father's girlfriend Ellissa's children from her home around the same time period. DCS removed the children due to drug use by Ellissa and Father. Ms. Miller testified that Father tested positive for "benzos" at the time DCS took custody of Ellissa's children, but he never showed anyone a valid prescription for the medication. Elissa eventually regained custody of her children, but by court order, Father is not allowed to be left alone with her children. Ms. Miller testified that Elissa's trailer was appropriate for her and her two children but not for Father's four children because it was only a two-bedroom trailer, and there was not adequate space for the children.

5

Angie Brown is a team leader for foster care with DCS. Ms. Brown testified that she has had an ongoing relationship with the family, having worked with Father since 2010, offering services through DCS to help keep the family intact. In fact, in her nineteen years with DCS, Ms. Brown testified that this family received more services than any other she has ever witnessed, with the goal of trying to steer the family in the "right direction." Ms. Brown stated DCS tried to help Father learn to be a better parent to his children with special needs but said the family would inevitably "fall apart" as soon as DCS ended their involvement.

Ms. Brown was assigned to the current case in December 2015, when the children were removed from the home. Ms. Brown testified that the children were taken into DCS custody due to

> neglect. They weren't taking their medications as prescribed. They . . . had their psychotropic meds in their pockets on the school bus to take at school. . . . And they c[a]me to school where they hadn't had baths and just a lot of neglect. A lot of violence, possible drug use in the home, a lot of adults [were] living in the home.

Regarding the home environment, Ms. Brown testified that "it's been years of chaos [and] fighting." According to Ms. Brown, at the time the children were removed, the family lived in the house along with Father's girlfriend, Ellissa M., her two children, and another man. Ms. Brown said there were several issues making the home inappropriate including issues with domestic violence that had been "ongoing for years," periods of time where the home had no water or electricity, and no food. Furthermore, Ms. Brown testified that Father did nothing to remedy any of those deficiencies. Ms. Brown also said Father taught the boys to fight and wrestle and allowed the children to use objects to hit one another during home wrestling matches.

Ms. Brown went on to say that in the years she had worked with the family, they had always managed to remain intact with the help of DCS. This time was seemingly different, because around the same time of the children's removal, Mother and Father separated. Ms. Brown remarked that "this time, it's like they separated, went on their separate ways, and left the kids with us. And it was odd." She continued, "I figured, you know, we'd be dysfunctional together trying to make it functional like we had all these years, but they changed."

Ms. Brown learned that Father moved to Woodbury to stay with his girlfriend, but Father refused to allow DCS to visit him there. In the past, Father had always been compliant with DCS and worked with caseworkers to regain custody of his children. Now, Ms. Brown said "it [was] like we didn't see him anymore" after he started dating his girlfriend. Ms. Brown offered Father gas cards to assist in paying for transportation to visit his children, which Father refused to accept, and she attempted to set up visits with

his children, but Father "didn't visit much." Ms. Brown also tried to schedule his psychological assessment, but Father did not feel the appointments were necessary. Additionally, Father would not maintain contact with Ms. Brown, making it difficult to assist him in completing necessary steps to the permanency plans.

Ms. Brown testified that in the two years this case has been pending, Father has made "zero progress" in complying with DCS to regain custody of his children. She was not aware of Father providing any nonmonetary support, such as clothes, food, toiletries, books or toys, to the children throughout the case. Father did submit to a drug screen on the day of trial, which he passed, but on that same day he also told Ms. Brown that he would not be able to parent Cody and Gaberiel due to their special needs. Father also admitted to her that day he still does not have stable housing and that he moves back and forth between his mother's and his girlfriend's house. Ms. Brown testified that the children have been in and out of DCS custody their entire lives, that they need stability and permanence, and that it is in the children's best interests that Father's parental rights be terminated.

Sarah Halliburton, a family support worker with DCS, was assigned to this case from April 2016 through November 2016. During that timeframe, she assisted with the development of the second permanency plan and testified about the reasonable efforts made to assist Father in completing the requirements of the plan. Ms. Halliburton testified that Father has not paid any child support in the last two years since his children were removed. Father told Ms. Halliburton that he had a job and was working; however, he refused to give her any information about where he worked or how much money he made.

Ms. Halliburton also testified that Father failed to visit the children regularly. During the time she was assigned to the case, Father attended eight out of a possible twenty-seven scheduled visits. Of the eight visits, none of the visits were with Gaberiel or Cody, and two of the visits were shortened because Father left during the visit or ended the visit early. Ms. Halliburton testified that the last time Father saw Gaberiel and Cody was April 2016, and the last time he saw Ryan and Tristian was August 2016.

DCS made extensive efforts to assist Father in completing his psychological evaluation requirement. After refusing to see Dr. Herman, Ms. Halliburton set up a series of appointments with John Crody, Father's preferred provider, in June and July of 2016. Father only attended one of the four scheduled appointments despite multiple calls and follow-ups with Father. Ms. Halliburton next attempted to schedule an appointment for Father with Dr. Sewell in September 2016, which Father also did not attend. Finally, Ms. Halliburton scheduled a November 2016 appointment with Dr. Herman which, not surprisingly, Father did not attend. Ms. Halliburton testified that she ensured Father had transportation to all scheduled appointments and even offered Father gas cards on multiple occasions, which Father refused.

Father was required to attend a parenting class specifically geared towards parenting children with special needs. Ms. Halliburton explained that Cody has bipolar disorder, ADHD, ODD, and he is diabetic. Gaberiel has a mild form of autism, and Tristian has speech, motor, and cognitive developmental delays. Father, however, did not complete the parenting class.

Ms. Halliburton contacted Father numerous times to schedule announced visits to Father's home. Father habitually cancelled these visits and refused to give Ms. Halliburton an updated address saying, "it wasn't needed." In August 2016, after obtaining Father's address independently, Ms. Halliburton went to Father's house for an unannounced visit, but no one was home. Later that month, Father sent her a text message that said, "Please do not contact me any further." Aside from "one or two CFTMs," Father has not participated in this case since the children were declared dependent and neglected. Father also refused to sign releases as required under the permanency plans to allow DCS to obtain necessary records. Ms. Halliburton opined that in all likelihood, Father would not complete the goals and requirements of the permanency plans in the near future because Father had not completed any of the requirements to date and had not maintained contact with DCS. Ms. Halliburton further opined that the children would suffer further abuse and neglect if returned to Father.

Contrary to what the DCS employees testified, Father claimed that when DCS became involved with the current removal of his children in late 2015, he was not living in the same house as Mother and the children. Instead, Father testified that he was living with his girlfriend and her two children in Woodbury, Tennessee. Father testified that the children lived with Mother after he and Mother separated because, at that time, he did "not have a job" or a home of his own. Father admittedly had "no way of feeding them" or supporting them, and acknowledged he "left a terrible impact on the kids," that he has to "live with … every day."

When asked about the accusations of using derogatory language in the home, Father admitted he encouraged his children to use improper language when addressing their mother. Father said he did not realize that encouraging such language would affect his children negatively.

Father had been "very compliant" with DCS "for many years" but testified that he grew "tired of it." Father claimed Ms. Halliburton bullied him and gave him an ultimatum of complying with the permanency plans' requirements or risk losing visitation with his children. Father stated he had allowed DCS caseworkers inside his home on multiple occasions over the years but that he started refusing the visits from DCS once he felt bullied by Ms. Halliburton.

Because of the children's various health and educational needs, the children were placed in different schools and cities across the state. One reason Father gave for not visiting the children was that he gets "very restless on long drives" and has "the patience of a squirrel." Father said the reason he refused to accept the gas cards from DCS was because he did not want to depend on government assistance.

Regarding his required psychological evaluation, Father admitted he only went to see John Crody for one of the four scheduled appointments because Father felt like the appointments were "a big waste of [his] time." When asked about his attendance at various hearings throughout the case, Father mistakenly believed he had only missed two hearings. The evidence showed, however, that Father had missed at least six hearings. Father did recall speaking with Ms. Brown in the basement of the courthouse on the morning of one of the hearings but said that he got upset and left prior to the hearing. As a result, Father admittedly missed court on that day.

Father answered questions about his educational background and employment history. He testified that he graduated from high school and completed an art institute program. Father proceeded to list several jobs he had over the past two years, which consisted mostly of seasonal work in farming, and testified that he was currently working for J. Davis Construction approximately thirty hours per week. Father stated he did not disclose his employment status or income to DCS because he did not feel like it was anyone else's business how much money he made. Initially, Father refused to answer questions about his income on the witness stand, prompting a direct order from the judge, before finally stating that he currently made eleven dollars per hour with his construction job. Additionally, Father admitted he did not have a house or car payment and that his major monthly expenses consisted of food because Father stated he was "a big boy" and "lik[ed] to eat."

DCS produced a report indicating that no child support had been paid to date by Father for any of the children. Father disputed this report, producing documentation of child support ordered and paid beginning in July 2017, some six months after the termination petition was filed.

Father admitted he had not yet secured suitable housing at the time of trial but stated "even if … they had to live in a tent with me," he should be permitted to live with his four children in a tent and pretend they were temporarily "camping, [and] having fun." In the alternative, Father conceded, "Even if they gotta stay in foster care, I'll chalk that one up, because I know sooner or later, they'll be 18, and I get to see them again. And I'll let them boys belt me right in the nose."

In an order filed on February 20, 2018, the juvenile court terminated Father's parental rights on the grounds of abandonment by willful failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency

plans, persistence of conditions, and failure to manifest an ability and willingness to personally assume custody or financial responsibility of the children. The juvenile court also found that terminating Father's parental rights was in the children's best interest. Father now appeals.

## ISSUES

Father raises the following issues, which we have restated slightly:

1. Whether clear and convincing evidence of any statutory grounds supports the juvenile court's decision to terminate Father's parental rights.
2. Whether clear and convincing evidence supports the juvenile court's finding that termination was in the children's best interest.

## STANDARD OF REVIEW

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). "To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R.*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)).

However, because of the heightened burden of proof in termination proceedings, this court must make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

ANALYSIS

I.     GROUNDS FOR TERMINATION

A.     Abandonment by Willful Failure to Support

Abandonment is one statutory ground for the termination of parental rights. Tenn. Code Ann. § 36–1–113(g)(1). Tennessee Code Annotated section 36–1–102 defines "abandonment" by failure to support, in relevant part, to mean

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017).[3] A parent's conduct is willful if the parent "ha[s] the capacity to provide the support, make[s] no attempt to provide support, and ha[s] no justifiable excuse for not providing the support." *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 525 (Tenn. Ct. App. 2004); *see also In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). If a parent is financially unable to support a child, then the failure to support is not willful. *In re Audrey S.*, 182 S.W.3d at 864 fn. 33.

Parents who are eighteen years of age or older are presumed to be aware of their legal obligation to support their children. *See* Tenn. Code Ann. § 36-1-102(1)(H). Moreover, a parent's duty to pay support "exists even in the absence of a court order to do so." *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *8 (Tenn. Ct. App. Nov. 19, 2013) (quoting *Culbertson*, 152 S.W.3d at 523–24).

---

[3] As this Court recently explained in *In re Gabriel B.*:

> The statute defining "abandonment" was amended effective July 1, 2018, and as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. The parent (or guardian) will have to prove by a preponderance of the evidence that the failure to visit or support was not willful.

No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 fn. 7 (Tenn. Ct. App. July 23, 2018). Because this change is substantive, the amended statute does not apply retroactively to this case. *Id.* (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004)).

Here, DCS filed the termination petition on January 3, 2017. Thus, the relevant four-month period runs from September 2, 2016 to January 2, 2017. Although Father was aware of his obligation to pay support, he paid no child support whatsoever until ordered by a court to do so in July 2017, six months after the termination petition was filed, which is outside the relative time period. Father also provided no nonmonetary support for the children, such as clothing or food. The evidence showed that Father was able-bodied and capable of working and, in fact, worked several jobs throughout the relevant time period. Additionally, his expenses were minimal. Father testified his only major expense was food, as he had no house payment or car payment. He therefore could have provided some financial support for his children but willfully chose not to do so. *See In re Damon G.*, No. W2010-02164-COA-R3-PT, 2011 WL 826811, at *3 (Tenn. Ct. App. Mar. 10, 2011) (affirming the trial court's finding that parents willfully failed to support their children where they "made no attempt to provide for their [children's] financial support" despite limited income). For these reasons, we find there is clear and convincing evidence that Father abandoned the children by willfully failing to support them.

### B. Abandonment by Failure to Provide a Suitable Home

Abandonment is also grounds for parental termination under Tenn. Code Ann. § 36-1-113(g)(1) where the parent is found to have abandoned the children by willfully failing to establish a suitable home. According to Tenn. Code Ann. § 36–1–102, in relevant part, abandonment may be found when:

(ii)(a) The child has been removed from the home or the physical or legal custody of a parent … by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department …;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department … made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department … made reasonable efforts to assist the parent … to establish a suitable home for the child, but that the parent … ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department … to assist a parent … in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or

12

exceed the efforts of the parent … toward the same goal, when the parent … is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). Thus, the statute requires DCS to prove, with respect to the relevant four-month time period, three elements: (1) Father failed to make reasonable efforts to provide a suitable home, (2) DCS "made reasonable efforts to assist [Father] ... to establish a suitable home," and (3) Father "demonstrated a lack of concern for the child[ren] to such a degree that it appears unlikely that [he] will be able to provide a suitable home for the child[ren] at an early date." *In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at *7 (Tenn. Ct. App. Sept. 27, 2017) (quoting Tenn. Code Ann. § 36–1–102(1)(A)(ii)). In this case, the relevant four-month time period following the children's removal runs from December 12, 2015, to April 12, 2016.

A suitable home "requires more than a proper physical living location." *In re Hannah H.*, No. E2013–01211–COA–R3–PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007–00561–COA–R3–PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.* Additionally, a parent's failure to cooperate with DCS and comply with the requirements of various counseling services is "directly related to the establishment and maintenance of a suitable home," *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009), and a suitable home "requires the presence of a care giver who can supply the care and attention [a child] needs." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002).

Here, the children were removed from the home December 11, 2015, and were later adjudicated dependent and neglected. In the four months following the children's removal and beyond, DCS attempted to help Father establish a suitable home by supervising visits, attempting to conduct home visits, conducting several CFTMs, attempting to arrange public transportation so that Father could visit his children, requesting funding for transportation, attempting to arrange and requesting funding for Father's psychological evaluation, offering to provide Father with gas cards, and encouraging Father to complete his tasks under the permanency plans.

Father, however, failed to make reciprocal efforts. During the first four months after the children's removal, Father lived with his girlfriend, whose own children were taken into DCS custody at the same time DCS removed Father's children from his home. DCS attempted to conduct a home study, which Father refused, and he did not complete any services designed to address the conditions that led to the children's removal. Father never provided DCS with proof of safe and stable housing, nor did he allow DCS to conduct announced or unannounced home visits.

Father also never completed any counseling geared towards parenting children with special needs. Moreover, on the morning of trial, Father admitted to Ms. Brown he

would not be able to parent Cody or Gaberiel due to their special needs. He also told Ms. Brown that morning that he was "bouncing from house to house right now," alternating between living with his mother and staying at his girlfriend's house. There is not adequate space for Father's four boys to live with Father, his girlfriend, and her two children in her two-bedroom trailer. Father admittedly had very few monthly expenses aside from food, yet he testified that he was still trying to save up money for utility deposits so he could obtain housing of his own. Moreover, Father made the outlandish argument that he should be permitted to pitch a tent and live with the children there for the unforeseeable future.

Father's lack of cooperation with DCS and failure to improve his own living situation demonstrated that he would not be able to provide a suitable home for the children at an early date. *See State Dep't of Children's Servs. v. M.P.*, 173 S.W.3d 794, 805–06 (Tenn. Ct. App. 2005) (holding that the parents "would be unable to provide the child with a suitable home in the foreseeable future" where the parents' level of cooperation was "very minimal"). Despite this case pending for two years, Father does not have housing of his own, let alone housing that is suitable for his children. Therefore, we find there is clear and convincing evidence that Father abandoned the children by failure to provide a suitable home.

### C.     Substantial Noncompliance

A parent's parental rights may be terminated when the parent is in "substantial noncompliance ... with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36–1–113(g)(2). Terminating parental rights based on substantial noncompliance "requires more proof than that a person has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed on this ground, the trial court must find "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *Id.* The trial court must then find that the noncompliance is substantial. *Id.*

Here, two permanency plans were developed before DCS filed the termination petition. In the order terminating Father's parental rights, the juvenile court found that Father's responsibilities under the plans "were all reasonably related to remedying the conditions that necessitate[d] foster care." Ms. Brown testified that Father had a clear understanding of what he was expected to do under the permanency plans "because [he had] completed [the] steps before" and successfully completed requirements of previous permanency plans. Father, however, completed nothing under the plans this time.

Father did not complete his psychological evaluation or participate in counseling geared toward parenting children with special needs, nor did he maintain regular visitation with the children. From the children's removal in December 2015 to the

suspension of Father's visitation rights in December 2016, Father missed thirty-four scheduled visits, and of the few visits he did attend, he ended two of them early. Father never petitioned the court to reinstate his visitation rights. He had not visited Ryan and Tristian since August 12, 2016 — almost seventeen months before trial. And he had not visited Gaberiel and Cody since April 5, 2016 — twenty-one months before trial.

Father did not maintain regular contact with DCS. Ms. Halliburton attempted to schedule appointments with Father on several occasions, but Father either refused or cancelled the appointments and ultimately sent a text message to Ms. Halliburton stating, "Please do not contact me any further." Ms. Brown testified that in the years she had worked with Father, he had always remained in contact with her and complied with DCS to keep the family intact. This time, Ms. Brown acknowledged things were different. After the parents separated, she said Father went his separate way, "and left the kids with [DCS]."

Father did not provide DCS with proof of legal income. He refused to tell any of the caseworkers where he was working or how much money he made, stating that he did not think it was their business, and Father refused to develop a budget as required by the plan. He also paid no child support whatsoever until July 2017 — six months after DCS filed the termination petition — even though he had the ability to do so.

Furthermore, as discussed above, Father did not comply with his responsibilities related to maintaining a suitable home. He never provided DCS with proof of safe and stable housing, nor did he allow DCS to conduct announced or unannounced home visits. The morning of trial, he told Ms. Brown that he still had not obtained stable housing for the children, and he admitted that he was currently was "bouncing from house to house."

For these reasons, we find there is clear and convincing evidence that Father was substantially noncompliant with his responsibilities under the permanency plans.

### D. Persistence of Conditions

The juvenile court also found that terminating Father's parental rights was appropriate under Tennessee Code Annotated § 36–1–113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. This ground for termination occurs when:

[t]he child has been removed from the home of the parent … by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further

abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent …, still persist[s];

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent … in the near future; and

(C) The continuation of the parent … and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36–1–113(g)(3) (2017). The goal of this ground is to avoid having a child linger in foster care if a parent cannot demonstrate the ability to provide a safe and caring environment for the child within a reasonable amount of time. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Therefore, the question before the court is "the likelihood that the child can be safely returned" to the parent's custody, "not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999–02079–COA–R3–CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Here, the children were removed from the home in December 2015, well over the six month requirement under this ground. At the time of trial, the conditions that led to the children's removal persisted. DCS removed the children from the home due to domestic violence in the home, medical neglect, environmental neglect, and the parents' substance abuse. Father, however, completed none of the services designed to address those concerns. As previously discussed, he did not complete a psychological evaluation, nor did he participate in counseling geared toward parenting children with special needs, establish safe and stable housing, or otherwise complete the goals under the permanency plans.

The conditions were unlikely to be remedied at an early date. Father had over two years to cooperate with DCS and make the necessary adjustments that would enable the children's safe return to his care. Yet, as discussed above, he did nothing to address the issues that led to the children's removal. Father did not pay child support until six months after the termination petition was filed and never provided DCS with proof of legal income. Accordingly, Ms. Brown did not believe that Father would be able to provide a suitable home in the near future. She further testified that in the two years this case has been pending, Father has made "zero progress" in complying with DCS to regain custody of his children, and Ms. Halliburton believed that, due to Father's failure to complete the necessary services, he was "not willing to work to get [his] children back." DCS could not declare Father's housing suitable in part because he refused to let DCS on the property.

Continuation of the parent-child relationship greatly diminished the children's chances of early integration into a safe, stable, and permanent home. As discussed above, at the time of trial, Father had not addressed the conditions that led to the children's removal or obtained safe and stable housing and was therefore in no position to care for the children. Meanwhile, the children's conditions had improved. Ryan and Tristian were doing well in their resource home; they had no behavioral issues and were succeeding academically. Cody had made progress at Parkridge Valley Academy. He received an individualized education program "to meet his specialized learning needs," and his behavior and social skills had improved. Gaberiel received individual counseling through Centerstone and anger management through My Friend's House, and he no longer required mental-health medication.

As is the case here, where DCS made "efforts to provide help to improve the parenting abilities" over a long period of time, and those efforts have proved ineffective, we can justifiably conclude "that there is little likelihood of such improvement as would allow the safe return" of the children to Father in the near future. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). For these reasons, we affirm the juvenile court's termination of Father's parental rights on the ground of persistence of conditions.

### E. Ability and Willingness to Assume Custody

The juvenile court also found that termination of Father's parental rights was appropriate due to Father's failure to show an ability and willingness to assume custody of the children. Under this ground, a parent's rights may be terminated when the parent

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). With this ground for termination, the petitioner must prove two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). First, the petitioner must prove that the parent "has failed to manifest … an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

Father failed to manifest an ability and willingness to assume legal and physical custody of the children.[4] When the first permanency plan was developed on December 29, 2016 — just two weeks after the children were removed — DCS explained to Father his responsibilities under the plan, and he appeared to have a clear understanding of those responsibilities. Six months later, in June 2016, Ms. Halliburton provided Father with a copy of the TPR Criteria and discussed it with him. Nevertheless, Father did not complete a psychological evaluation, participate in the counseling geared toward parenting children with special needs, establish safe and stable housing (or provide proof thereof), or otherwise complete his responsibilities under the permanency plans.

Father also failed to manifest an ability and willingness to assume financial responsibility of the children. As discussed above, Father was capable of working and worked at several different places while this case was pending. Father did not have a house or car payment and admitted that his major monthly expenses consisted of food, because he was "a big boy" and "lik[ed] to eat." Yet the evidence showed Father paid no child support whatsoever until July 2017, six months after DCS filed the termination petition, and moreover, he never provided any of the children with any nonmonetary support such as clothes, food, toiletries, books or toys.

Moreover, the same evidence supports the determination that placing the children in Father's legal and physical custody would pose a risk of substantial harm to their physical or psychological welfare. As discussed above, Father had not established safe and stable housing or otherwise completed his tasks under the permanency plans aimed at remedying the conditions that necessitated the children's placement in foster care. Ms. Brown testified that domestic violence in the home had been ongoing for years, and she described the wrestling matches Father condoned between the children in the family living room, during which Father allowed the children to use objects to hit one another. Additionally, Father taught the children that it was acceptable to curse at their mother and call her ugly names, and he explicitly told the children that they did not have to listen to what women said. Father later admitted he did not realize the impact his teachings had on the children's mindsets and behavior. Father made "zero progress" in remedying his situation and even admitted on the day of trial that he did not have the ability to parent his two children with special needs. Meanwhile, the children were doing well in foster care and had made progress in their various schools.

---

[4] This ground for termination is a fairly recent addition to the statutory framework, effective as of July 1, 2016. *See* 2016 Tenn. Pub. Acts, Ch. 919 § 20 (S.B. 1393). Currently, there is an apparent split of authority regarding the interpretation of Tenn. Code Ann. § 36-1-113(g)(14). The issue remains unsettled whether this ground can be relied upon to terminate parental rights if a parent has manifested a willingness but not an ability to assume legal and physical custody or financial responsibility for the child. *In re Amynn K.*, E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018). Here, Father failed to manifest both an ability and a willingness to take care of the children, so we need not address the varying interpretations of Tenn. Code Ann. § 36-1-113(g)(14).

For these reasons, we affirm the juvenile court's termination of Father's parental rights on this ground.

## II.     BEST INTEREST

After at least one ground for parental termination has been established by clear and convincing evidence, the court must then determine whether termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1)–(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). In making that determination, the court views the child's best interests "from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Our legislature has identified nine statutory factors for the court to consider in conducting a best-interests analysis. They include:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court does not have to find the existence of each of these nine factors before it may conclude that termination is in the child's best interest. *In re Navada N.*, 498 S.W.3d 579, 607 (Tenn. Ct. App. 2016). "Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *Id.* However, as the Tennessee Supreme Court recently held,

> this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). Neither is the trial court required to total up each of the factors and determine whether the sum of them weighs in favor or against the parent. *In re Audrey S.,* 182 S.W.3d at 878. "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

Here, the juvenile court analyzed the nine statutory factors and found that terminating Father's parental rights was in the children's best interest.

Father has not made any adjustments of circumstances, conduct, or conditions as to make it safe and in the best interest of the children to be in the home. *See* Tenn. Code. Ann. § 36-1-113(i)(1). The same conditions exist today that existed at the time of the removal. Father admittedly does not know how to care for children with special needs, and there is no evidence of any kind of safe and stable housing for the children.

Additionally, Father failed to make any lasting adjustments after reasonable efforts by DCS for such a length of time that a lasting adjustment no longer appears to be reasonably possible. *See* Tenn. Code. Ann. § 36-1-113(i)(2). To assist Father in reunification with the children, DCS supervised visits, attempted to conduct home visits, conducted several CFTMs, attempted to arrange public transportation, requested funding for transportation, attempted to arrange and requested funding for Father's psychological evaluation, offered to provide Father with gas cards, and encouraged Father to complete

his tasks under the permanency plans. Per the juvenile court's order, "For at least seven (7) years, [DCS] has tried to prevent getting to the place we are at today." Despite having all of these available resources, Father refused to remain in contact with DCS or accept the services offered to him.

Father has not maintained regular visitation or contact with the children. *See* Tenn. Code. Ann. § 36-1-113(i)(3). It has been over a year-and-a-half since Father saw Ryan or Tristian, and close to two years since he has seen Gaberiel or Cody. Any meaningful relationship Father might once have had with the children is no longer established. *See* Tenn. Code. Ann. § 36-1-113(i)(4). Ms. Halliburton testified that Father had demonstrated no interest whatsoever in the welfare of the children. The physical environment of Father's home was not healthy or safe for the children. *See* Tenn. Code Ann. § 36-1-113(i)(7). At the time of trial, Father still had not obtained stable housing for the children and went "back and forth" between his girlfriend's home and his mother's home—who, along with her husband, was physically unable to care for the children. Father did not pay child support consistent with the child-support guidelines. *See* Tenn. Code Ann. § 36-1-113(i)(9). Evidence showed that Father did not pay any child support whatsoever until July 2017—six months after DCS filed their termination petition, and there was no evidence that Father provided any kind of nonmonetary support for the children.

Finally, a change of caretakers and physical environment would have a negative effect on the children's emotional, psychological, and medical conditions. *See* Tenn. Code Ann. § 36-1-113(i)(5). As discussed above, Father demonstrated a complete lack of concern for the children and had done nothing throughout the two-year custodial period to remedy the conditions that led to the children's removal. Father seemingly acknowledged that the children would need to remain in foster care. He testified that he would "chalk that one up," and let the "boys belt [him] right in the nose" as a result of his failed parenting skills. Meanwhile, the children were doing well in foster care and had made progress. Ryan and Tristian were doing well in their resource home. They had no behavioral issues and were succeeding academically. Cody was receiving an individualized education program "to meet his specialized learning needs," and his behavior and social skills had improved. Gaberiel received individual counseling and anger management, and he no longer required mental-health medication.

It is clear that in making its finding, the juvenile court thoroughly examined the nine statutory best interest factors and found that terminating Father's parental rights was in the children's best interest. The record fully supports this finding. Therefore, we affirm the juvenile court's decision that terminating Father's parental rights was in the best interest of the children.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Robert Alan S.

_____
FRANK G. CLEMENT JR., P.J., M.S.